Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| LUIS JIMÉNEZ CABRERA<br><br>Recurrente<br><br>v.<br><br>JUNTA DE LIBERTAD BAJO PALABRA<br><br>Recurrida | TA2025RA00084 | *Revisión*<br>procedente de la Junta de Libertad Bajo Palabra<br><br>Caso Núm.:<br>147554<br><br>Querella Núm.:<br>24-087<br><br>Sobre:<br>Final/Revocación de Libertad Bajo Palabra |

Panel integrado por su presidenta, la Jueza Rivera Marchand, la Jueza Martínez Cordero y el Juez Cruz Hiraldo.

*Martínez Cordero, jueza ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de agosto de 2025.

Comparece Luis Jiménez Cabrera (en adelante, recurrente y/o señor Jiménez Cabrera) mediante un *Recurso de Revisión,* para solicitar que revisemos la *Resolución* emitida el 15 de mayo de 2025, archivada en autos el día 19, y notificada el día 28, del mismo mes y año, por la Junta de Libertad Bajo Palabra (en adelante, JLBP).[1] Mediante la *Resolución* recurrida, la JLBP dispuso revocar el privilegio de libertad bajo palabra al recurrente por violación a las condiciones número 21 y 26, y los incisos (a), (b) y (e) de la condición número 34 del mandato de libertad bajo palabra. Además, ordenó el archivo de la condición número 11, y los incisos (c) y (f) de la condición número 34.

Por los fundamentos que expondremos, se *confirma* la *Resolución* recurrida.

---

[1] Sistema Unificado de Manejo y Administración de Casos del Tribunal de Apelaciones (SUMAC TA), a la Entrada Núm. 8, Anejo 1(A), págs. 15-27.

I

Surge de los autos ante nuestra consideración que, mientras el recurrente se encontraba cumpliendo una sentencia de veinte (20) años, por los delitos de asesinato atenuado, robo agravado, escalamiento agravado, uso de disfraz en la comisión del delito y violaciones a la ley de armas, el 28 de diciembre de 2023, y luego de varios trámites procesales, la JLBP emitió una *Resolución* mediante la cual le concedió el privilegio de Libertad bajo palabra,[2] sujeto al cumplimiento estricto de treinta y cuatro (34) condiciones que se incluyeron en su *Certificado de libertad bajo palabra.*[3]

Así las cosas, el recurrente recibió una misiva fechada del 25 de enero de 2024, mediante la cual se le notificó que la JLBP había acordado concederle el privilegio de Libertad bajo palabra, efectivo el 15 de febrero de 2024, y ciertos pasos a seguir.[4] Este privilegio, se le concedió bajo la condición general de que quedaría bajo la custodia legal de la JLBP, quien podría ordenar su arresto y reingresarlo a la institución correccional en cualquier momento que a su juicio su conducta fuera incompatible con la seguridad pública o su propia seguridad.

El mismo día en cual se hizo efectivo su privilegio de libertad bajo palabra, entiéndase, el 15 de febrero de 2024, el recurrente fue orientado en cuanto al programa de supervisión electrónica.[5] Según se deprende del documento intitulado *Orientación a los participantes del programa de supervisión electrónica al momento de ser instalado,* el cual fue firmado por el recurrente, específicamente, se le orientó del delito de manipulación o daño al sistema de supervisión electrónica, establecido por el Artículo 278 del Código Penal de Puerto Rico de 2012,[6] y en cuanto a que la violación de cualquiera

---

[2] SUMAC TA, a la Entrada Núm.1, Apéndice Núm. 4, Anejo XVII.
[3] *Íd.,* a la Entrada Núm. 8, Anejo 1 (C), págs. 15-16 y 21-27, respectivamente.
[4] *Íd.,* págs. 3-14.
[5] *Íd.,* a la Entrada Núm. 1, Apéndice Núm. 4, Anejo XVI.
[6] Ley 146-2012, 33 LPRA sec. 5371...

de las condiciones impuesta podía conllevar el arresto y el reingreso a la institución penal.

De ahí, el 30 de julio de 2024, se celebró una vista de seguimiento. Celebrada la misma, el 23 de agosto de 2024, la JLBP emitió una *Resolución*, mediante la cual concluyó que el recurrente era merecedor de continuar en libertad bajo palabra, por lo que ordenó que continuara beneficiándose del antedicho privilegio, conforme a las condiciones de su mandato de libertad bajo palabra, las cuales debía cumplir fielmente.[7]

Pasado un tiempo, el 18 de octubre de 2024, la Técnica de Servicios Sociopenales, Myriam Montañez Serrano (señora Montañez Serrano), remitió un *Informe de violación de condiciones*, recibido por la JLBP el día 22, del mismo mes y año.[8] En este, expresó que, el 14 de octubre de 2024, recibió un informe de la Unidad de Supervisión Electrónica en el cual se indicó que, 12 de octubre de 2024, el dispositivo electrónico del peticionario fue manipulado desde horas de la mañana. Del informe se desprende que, conforme a la investigación realizada, se llegó a la conclusión de que el peticionario impidió que el dispositivo recibiera cobertura celular y satelital durante el periodo de 6:53 a.m. a 8:35 p.m. del día señalado. Por otro lado, se detalló que el peticionario, durante el antedicho periodo, entró a la zona de exclusión. Así, pues, se determinó que, por razón de la señalada conducta, el peticionario violentó las condiciones número 24, 32, 33 y los incisos (a), (b) y (d) de la condición número 34 de su mandato de libertad bajo palabra.

Recibido el antedicho informe, el 22 de octubre de 2024, la JLBP dispuso que de este se desprendía que existía posible infracción a las condiciones número 11, 21, 26 y 34, bajo las cuales fue puesto en libertad al recurrente. A tenor, emitió una orden de

---

[7] SUMAC TA, a la Entrada Núm. 8, Anejo 1(B), págs. 127-131.
[8] *Íd.*, a la Entrada Núm. 1, Apéndice Núm. 4, Anejo XV.

arresto en contra del peticionario, la cual le fue notificada en igual fecha.[9]

Así las cosas, la JLBP citó al peticionario a una vista sumaria inicial en la cual se determinaría si existía causa probable para creer que había violado las condiciones antes señaladas.[10]

Celebrada la vista, el 12 de noviembre de 2024, el Oficial Examinador emitió el *Informe del Oficial Examinador*,[11] en el cual recomendó que se determinara causa probable por violación a las condiciones 11, 21, 26 y 34 del mandato de libertad bajo palabra.

Posteriormente, el 14 de noviembre de 2024, la JLBP emitió una *Resolución*, mediante la cual acogió la recomendación del Oficial Examinador.[12] Por tanto, determinó causa probable por violación a las condiciones antes descritas. Esta determinación fue archivada en autos el 20 de noviembre de 2024, y notificada al recurrente el 3 de diciembre del mismo año.

Se desprende de los autos que, el 21 de noviembre de 2024, la JLBP calendarizó la vista final para el 12 de diciembre de 2024.[13] Llamado el caso el 12 de diciembre de 2024, la JLBP dispuso reseñalar la vista final para el 4 de febrero de 2025.[14]

A la vista final compareció el recurrente por sí y representado por abogado, así como la Técnico Sociopenal, la señora Montañez Serrano, del Programa de Comunidad de Humacao del Departamento de Corrección y Rehabilitación.[15]

---

[9] SUMAC TA, a la Entrada Núm.1, Apéndice Núm. 4, Anejo XIV.

[10] *Íd.*, Anejo XII.

[11] *Íd.*, Entrada Núm. 8, Apéndice 1(A), págs. 281-285.

[12] *Íd.*, págs. 193- 201 y 265- 273, respectivamente.

[13] *Íd.*, págs. 259-286.

[14] *Íd.*, págs. 215-217.

[15] Durante la vista, se recibió prueba testimonial de Marcos Torres Vicente, oficial de supervisión electrónica, la gerente de supervisión electrónica, Nina Quiñones Rodríguez; y los testigos del recurrente, Carlos R Elicier Encarnación, detective privado y Juan A. Marchena Martínez, quien era patrono del recurrente para la fecha de los hechos que suscitaron la acción del título.

Producto de la vista final, el 25 de marzo de 2025, la Oficial Examinadora, emitió un informe.[16] En su informe, recomendó una amonestación al recurrente por violación a las condiciones número 21, primera oración, y los incisos a, b y e de la condición número 34 del mandato de libertad bajo palabra. A tenor, recomendó su excarcelación, y apercibirle sobre las consecuencias de incurrir en conducta que diera fundamento para una querella ante la JLBP, la cual propiciaría que se iniciara un proceso de revocación de inmediato. Además, ordenó una enmienda a la condición número 6 del referido mandato, así como la celebración de una vista de seguimiento.

De ahí, el 15 de mayo de 2025, la JLBP emitió la *Resolución* recurrida.[17] La misma fue archivada en autos el 19 de mayo de 2025, y notificada el día 28, del mismo mes y año.[18] Mediante la antedicha *Resolución*, distinto a lo recomendado por la Oficial Examinadora, la JLBP dispuso revocar el privilegio de libertad bajo palabra al recurrente, por violación a las condiciones número 21 y 26, y los incisos (a), (b) y (e) de la condición número 34 del mandato de libertad bajo palabra. Además, ordenó el archivo de las condiciones número (11), y los incisos (c) y (f) de la condición número 34.

Como parte del dictamen emitido, la JLPB esgrimió las siguientes determinaciones de hechos:

1) Al querellado le fueron notificados cuatro (_4_) cargos por violación a las condiciones 11, 21, 26 y 34 del Mandato de libertad bajo palabra.

| Cargo Núm. uno | Condición Núm. 11 | Cooperará con la Junta de Libertad Bajo Palabra, con sus miembros individualmente y con todos sus oficiales examinadores, cuando le fuere requerido para tratar o considerar cualquier asunto relacionado con su caso. Deberá |
|---|---|---|

---

[16] SUMAC TA, a la Entrada Núm.1, Apéndice Núm. 3, Anejo V. Véase, además, SUMAC TA, Entrada Núm. 8, Anejo 1(A), págs. 75-82.
[17] SUMAC TA, a la Entrada Núm.1, Apéndice Núm. 3, Anejo III.
[18] *Íd.*, a la Entrada 8, Anejo 1(A), pág. 27.

| | | |
|---|---|---|
| | | observar una conducta respetuosa en todo momento. De igual manera, ' observará conducta respetuosa y serena mientras sea entrevistado por la Junta de Libertad Bajo Palabra, por algunos de sus Miembros o por cualquier Oficial Examinador de la Junta de Libertad Bajo Palabra. Del Informe de Violación de Condiciones recibido en la Junta el 22 de octubre de 2024, surge que el liberado-querellado luego de manipular su dispositivo electrónico, negó el acto incurrido ante su tss, este acto demuestra una dejadez y poco compromiso en su proceso rehabilitativo. |
| Cargo Núm. dos | Condición Núm. 21 | Mientras esté disfrutando de SUPERVISIÓN ELECTRÓNICA como condición al privilegio de Libertad Bajo Palabra, acepto que se me instale el Sistema de GPS y permanecer dentro de las zonas de inclusión establecidas. No me acercaré ni permaneceré en las siguientes zonas de exclusión: municipios de Cataño, Loíza y Bayamón. Según surgió de Informe de Violación de Condiciones recibido en la Junta el 22 de octubre de 2024, el liberado-querellado manipuló (bloqueó) la señal del dispositivo electrónico por más de una hora impidiendo que (el dispositivo electrónico) recibiera la cobertura celular y satelital el 12 de octubre de 2024 desde las 7:49 am. En adición el liberado-querellado entró a la zona de exclusión. |
| Cargo Núm. tres | Condición Núm. 26 | Entiendo que seré responsable por los daños causados al equipo de supervisión electrónica, que no sean causados por el uso normal del mismo. Si no entrego el equipo en buenas condiciones, deberé pagar su reparación o, de no entregar el mismo, deberé pagar el costo total. El 12 de octubre de 2024, el liberado-querellado manipuló (bloqueó) la señal del dispositivo electrónico por más de una hora impidiendo que éste recibiera la cobertura celular y satelital; y entró a la zona de exclusión, según surge del Informe de Marcos Torres Vicente de la Unidad de Supervisión Electrónica del 14 de octubre de 2024. El 16 de octubre de 2024, la tss encargada del caso mediante verificación observó que el |

| | | |
|---|---|---|
| | | dispositivo electrónico tenía los sellos manipulados. |
| Cargo Núm. cuatro | Condición Núm. 34 | El incumplimiento de las siguientes condiciones constituirá causa suficiente, por sí sola, para la revocación de la libertad bajo palabra: <br> a. pérdida de la señal del transmisor, por estar fuera del área delimitada por la programación establecida o por el técnico de servicio sociopenal; <br> b. señal de obstrucción o daño al dispositivo (grillete), a la unidad de rastreo portátil o al equipo; <br> c. dejar apagar el dispositivo (grillete) por falta de carga; <br> d. entrar o permanecer en la zona de exclusión establecida; <br> e. salir de la zona de inclusión establecida; <br> f. evidencia electrónica y física que indique que el dispositivo (grillete) ha sido removido. <br><br> Según el Informe de Violación de Condiciones recibido en la Junta el 22 de octubre de 2024, el liberado-querellado manipuló (bloqueó) la señal del dispositivo electrónico impidiendo que (el dispositivo electrónico) recibiera la cobertura celular y satelital el 12 de octubre de 2024. En [a]dición el liberado-querellado entró a la zona de exclusión. <br><br> El proceder del liberado-querellado es un claro indicador de que su finalidad era evadir la supervisión electrónica. |

2) El querellado fue citado para vista sumaria inicial celebrándose el 28 de octubre de 2024. Ese día se determinó causa por violación de las condiciones número 11, 21, 26 y 34, siendo citado a vista final para el 12 de diciembre de 2024.

3) La vista final pautada para el 12 de diciembre de 2024 fue suspendida a solicitud del Ledo. Jesús Miranda Díaz, abogado de récord del querellado, previa renuncia a términos, debido a que no compareció el oficial de supervisión electrónica, Marcos Torres Vicente y porque el querellado decidió contratar los servicios de un detective privado para asistir en el caso.

4) El querellado fue citado para vista final el 4 de febrero de 2025.

5) Luego de tomar juramento al querellado y a la tss Montañez Serrano, procedimos a identificar a los testigos presentes. Comparecieron como testigos Carlos R. Elicier Encarnación, detective privado, Juan A. Marchena Martínez, ex patrono del querellado, Marcos Torres Vicente, oficial de Supervisión Electrónica y Nina Quiñones Rodríguez, Gerente del

Programa de Supervisión Electrónica en Puerto Rico. Los testigos presentes fueron juramentados.

6) La tss vertió para récord el contenido del Informe de Violación de Condiciones recibido el 22 de octubre de 2024 y declaró que el 14 de octubre de 2024, recibió [el] Informe del oficial Marcos Torres Vicente de la Unidad de Supervisión Electrónica. De dicho informe surgió que el querellado[,] el 12 de octubre de 2024, incurrió en manipulación del dispositivo, bloqueando la señal desde las 6:53 am hasta las 8:35 pm. También, surgió que el querellado entró a la zona de exclusión, cerca de municipio de Loíza. La tss Montañez Serrano dialogó con el querellado y este alegó que no manipuló el dispositivo. Sin embargo, ella declaró que observó los sellos del dispositivo manipulados.

7) La tss Montañez Serrano declaró que el 11 de octubre de 2024, día antes de los hechos, no se encontraba en la oficina y que el reporte de Supervisión Electrónica lo realizó el oficial Marcos Torres Vicente.

8) La tss Montañez Serrano expresó que deja a discreción de la Junta la determinación final en este caso.

9) Del testimonio del oficial Torres Vicente surgió que este trabaja en el centro de mando de Supervisión Electrónica ubicado en Bayamón y cubre a los participantes en toda la isla.

10) El oficial Torres Vicente estableció con su testimonio lo siguiente: que se reflejó la manipulación del dispositivo electrónico desde las 6:53 am a 8:35 pm. El oficial narró la trayectoria del querellado desde que salió de su residencia en Naguabo el 12 de octubre de 2025, hasta que regresó a su hogar por el Norte de Puerto Rico. El oficial Torres Vicente estableció que el querellado no utilizó la ruta que tenía autorizada para regresar a su hogar, ya que, en vez de regresar por la ruta de Caguas, regresó por la ruta de Carolina. Sin embargo, no pudo establecer que el querellado entró en Loíza, municipio excluido en su mandato. El oficial Torres Vicente estableció que los hechos ocurrieron sábado, y el querellado no estaba autorizado a salir del hogar.

11) Del testimonio de la gerente de Supervisión Electrónica, Nina Quiñones Rodríguez[,] surgió que es la encargada del programa a nivel Puerto Rico y fue quien realizó la Certificación de Manipulación de Dispositivo el 14 de octubre de 2024. El testimonio de Quiñones Rodríguez cubrió la explicación de la trayectoria del querellado desde que salió de Naguabo, llegó al área metropolitana regresando por el área norte a su hogar en Naguabo. La gerente Quiñones estableció que la trayectoria del querellado el 12 de octubre de 2024, es incompatible con trayectorias pasadas.

12) De la Certificación de Manipulación de Dispositivo, preparada por la gerente Nina Quiñones, surgió lo siguiente: que para determinar cuando el dispositivo fue manipulado realizaron una evaluación de tiempo desde el 9 al 13 de octubre de 2024[,] siendo el día 12 de octubre de 2024 la fecha en que el dispositivo fue manipulado desde las 6:52 am a las 8:35 pm. También, surgió del informe que la zona de inclusión del querellado es las Parcelas Florida de Naguabo,

que durante los días 9 al 13 de octubre de 2024 no hubo averías en comunicación celular ni satelital para la zona geográfica asignada. Además, surgió del mencionado informe que durante los días 9 al 13 de octubre de 2024, ningún dispositivo asignado/ activo en el área circundante a la misma zona geográfica del querellado registró averías y/o dificultades de cobertura satelital y/o celular que el dispositivo manipulado por el querellado es el D0110277.

13) El testimonio de Quiñones Rodríguez estableció que el querellado pudo bloquear la señal del dispositivo ya que eso se reflejó en el sistema. Sin embargo, concluyó que el querellado no entró al municipio de Loíza, zona de exclusión, según surgió de la trayectoria de regreso al hogar.

14) El testimonio del patrono del querellado Juan A. Marchena Martínez giró en torno a que el 12 de octubre de 2024 el querellado se presentó a trabajar en horas tempranas y que realizaron diferentes rutas realizando trabajos en el área metropolitana. Se expresó del querellado como un excelente empleado, que labora con [é]l de 2 a 3 meses, de lunes a viernes y algunos sábados con permiso de su tss. Según Marchena Martínez dijo, que ese sábado 12 de octubre de 2024, realizaron varios servicios, entre ellos en la Avenida Barbosa y fueron a comprar una pieza. Expresó que el querellado terminó de trabajar a las 12:00 pm y se marchó.

15) Del testimonio del detective Carlos R. Elicier Encarnación, surgió y resumimos: que el querellado sí fue a laborar el 12 de octubre de 2024, con su patrono Juan A. Marchena Martínez ya que este investigó la ruta en la cual este realizó trabajos con el patrono y en efecto el resultado de su investigación lo ubica realizando diferentes zonas del área metropolitana hasta el mediodía, que se retiró a realizar un trabajo en el hogar de Gisela Santana, ubicado en Villa Fontana. Según su investigación el querellado llegó temprano a su hogar en Naguabo, de 3:30 a 4:00 pm, información corroborada con el padre del querellado[.]

16) El Lcdo. Miranda Díaz impugnó el hecho que el querellado estaba trabajando día sábado ya que adujo este hecho no fue incluido en los cargos imputados. También impugnó que su representado haya entrado en el municipio de Loíza, que es zona de exclusión. El Lcdo. Miranda fue enfático en que no se le puede imputar a su representado que estaba trabajando sábado sin autorización debido a que ese hecho no fue incluido en el Informe de Violación de Condiciones ni en el señalamiento de cargos.

17) La tss Montañez Serrano enfatizó que el querellado no contaba con permiso para trabajar el sábado 12 de octubre de 2025. También informó que el día antes de los hechos ella no se encontraba en su oficina. Admitió que radicó su querella a base de lo informado por los funcionarios de Supervisión Electrónica.

18) Alegaciones del Lcdo. Miranda con relación a su representado:

1. En cuanto a la condición número 11, luego de darle lectura[,] arguye que su representado no la incumplió, ya que esta se trata de cooperar con la Junta, con la tss

Montañez Serrano, para tratar cualquier asunto relacionado con su caso.

2. En cuanto a la condición número 21: luego de darle lectura, expresó que no se probó que su representado entró a las zonas de exclusión de los municipios de Cataño, Loíza y Bayamón[,] y que, de haber pasado cerca de Loíza no constituye entrar en dicho municipio.

3. En cuanto a la condición número 26, luego de dar lectura a la misma, expuso que no se pudo probar que el dispositivo tenía los sellos manipulados, tampoco que el querellado entró en la zona de exclusión.

4. En cuanto a la condición número 34, luego de darle lectura, dijo que su representado no causó daño al dispositivo, de acuerdo con el testimonio de la gerente del programa de Supervisión Electrónica, Nina Quiñones, que no se estableció que el querellado dejó apagar el dispositivo por falta de carga, que no se probó que el querellado entró o permaneció en la zona de exclusión y que no se probó que el dispositivo (grillete) haya sido removido.

19) La Oficial Examinadora que presidió la Vista Final identificó el dispositivo con el número D0110277 y le preguntó a la tss Montañez Serrano que, luego de haber escuchado la prueba testifical y revisada la prueba documental, si el querellado incumplió partes de la Condición número 34. La tss Montañez Serrano contestó lo siguiente: que el querellado incumplió los incisos a. pérdida de la señal, b. señal de obstrucción, obstrucción a la unidad de rastreo. También declaró que el querellado, que pasó por el municipio de Loíza, que es zona de exclusión, que salió de la zona de inclusión y que manipuló los sellos del dispositivo porque ella los vio manipulados. Por lo que consideramos que el querellado incumplió los incisos a, b, d y e de la Condición 34.[19]

Al amparo de las antes señaladas determinaciones de hechos, en su dictamen, la JLBP concluyó lo que: "el querellado no ha demostrado un verdadero compromiso con su rehabilitación, que este en un solo acto demostró que no tiene interés en cumplir con las condiciones que son impuestas a un liberado con Supervisión Electrónica, condiciones que están claramente expuestas en su mandato y en el contrato que firmó con el [DCR] [. . .]".[20]

Así, la JLBP dispuso la revocación del privilegio de libertad bajo palabra al recurrente, tras juzgar que este, según adelantamos,

---

[19] SUMAC TA, a la Entrada Núm. 1, Apéndice Núm. 4, Anejo III, págs. 12-15. Véase, además, SUMAC TA, a la Entrada Núm. 8, Apéndice 1(A), págs. 15-21.
[20] SUMAC TA, a la Entrada Núm. 1, Apéndice Núm. 4, Anejo III, pág. 16. Véase, además, SUMAC TA, a la Entrada Núm. 8, Apéndice 1(A), pág. 23.

violentó las condiciones número 21 y 26, y los incisos a, b y e de la condición número 34 del mandato de libertad bajo palabra. En lo referente a las condiciones número 21 y 26, concluyó que el recurrente incumplió las aludidas condiciones puesto a que pasó cerca de Loíza, de manera que entró a la zona de exclusión. Respecto a la violación de los incisos a, b y e de la condición número 34, lo fundamentó en que el recurrente, pese a no tener permiso para trabajar el día sábado, se reportó a laborar transitando por la carretera 30 de Caguas, una ruta incompatible con su ruta trazada de ida a San Juan y regreso de San Juan por la ruta de Caguas. Según se desprende de la *Resolución,* ese mismo día, el recurrente manipuló la señal del dispositivo y estuvo fuera de la cobertura satelital hasta las 8:35 p.m.

De otra parte, la JLBP ordenó el archivo de la condición número 11, así como de los incisos c y f de la condición número 34. En consecuencia, de todo lo anterior, ordenó devolver la custodia legal del recurrente al Departamento de Corrección y Rehabilitación (DCR), para que procediera de acuerdo con la Ley.

En desacuerdo, el 10 de junio de 2025, el recurrente interpuso una *Moción de reconsideración,*[21] la cual fue denegada mediante *Resolución* emitida el 12 de junio de 2025,[22] archivada en autos al día siguiente, y notificada el 30 de junio de 2025.[23]

Aún en desacuerdo, el 14 de julio de 2025, compareció el recurrente mediante un *Recurso de Revisión Administrativa* en el cual alzó los siguientes cinco (5) señalamientos de error:

1. Erró la Junta al revocar la libertad bajo palabra del peticionario mediante fundamentos no imputados formalmente, en violación al debido proceso de ley.

2. Erró la Junta al concluir que el peticionario violó la condición número 21 (zonas de exclusión), sin contar con prueba sustancial que demostrara entrada a municipios excluidos.

---

[21] SUMAC TA, a la Entrada Núm. 1, Apéndice Núm. 3, Anejo II.
[22] *Íd.,* Anejo I.
[23] *Íd.,* a la Entrada Núm. 8, Apéndice 1(A), pág. 1.

3. Erró la Junta al concluir que el peticionario manipuló su dispositivo electrónico, sin contar con prueba técnica certificada ni testimonio pericial que lo sustentara.

4. Erró la Junta al encontrar causa bajo la condición número 34 sin evidencia directa de las conductas tipificadas como causales automáticas de revocación

5. Erró la Junta al revocar la libertad bajo palabra del peticionario en contravención a la recomendación de su propia oficial examinadora, sin motivar ni justificar su apartamiento, a pesar de no haber presenciado la vista ni evaluado directamente la prueba.

El 21 de julio de 2025, compareció el recurrente para presentar la transcripción de la prueba oral (TPO), la cual fue estipulada por la JLBP. Finalmente, el 27 de agosto de 2025, compareció la JLBP mediante *Escrito en cumplimiento de Resolución*. Habiendo quedado el recurso perfeccionado, procederemos a disponer del mismo.

II

### A. Revisión Judicial

El Tribunal Supremo de Puerto Rico ha sostenido que el derecho a cuestionar la determinación de una agencia, mediante revisión judicial, es parte del debido proceso de ley protegido por la Constitución de Puerto Rico.[24] El Artículo 4.006 (c) de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico[25] otorga competencia apelativa al Tribunal de Apelaciones para revisar las decisiones, órdenes y resoluciones finales de las agencias administrativas.[26] La revisión judicial de las decisiones administrativas tiene como fin delimitar la discreción de los organismos administrativos, para asegurar que ejerzan sus funciones conforme a la ley y de forma razonable.[27] Esta doctrina dispone que corresponde a los tribunales examinar si las decisiones de las agencias administrativas fueron tomadas dentro de los

---

[24] *Asoc. Condómines v. Meadow Dev.*, 190DPR 843, 847 (2014); *Picorelli López v. Depto. de Hacienda*, 179 DPR 720, 736 (2010).
[25] Ley Núm. 201-2003, 4 LPRA sec. 24y(c).
[26] *Asoc. Condómines v. Meadows Dev.*, supra, a la pág. 847.
[27] *Empresas Ferrer v. ARPe*, 172 DPR 254, 264 (2007).

poderes delegados, y si son compatibles con la política pública que las origina.[28]

A esos efectos, la revisión judicial comprende tres (3) aspectos: (i) la concesión del remedio apropiado; (ii) la revisión de las determinaciones de hecho conforme al criterio de evidencia sustancial, y (iii) la revisión completa y absoluta de las conclusiones de derecho.[29] Nuestro Alto Foro ha establecido que el derecho a una notificación adecuada concede a las partes la oportunidad de tomar conocimiento real de la acción tomada por la agencia. Además, otorga a las personas, cuyos derechos pudieran quedar afectados, la oportunidad para decidir si ejercen los remedios que la ley les reserva para impugnar la determinación.[30]

Es norma sabida que los tribunales apelativos, al ejercer su función revisora, deben conceder una gran deferencia a las decisiones emitidas por las agencias, debido a la vasta experiencia y conocimiento especializado en los asuntos que les han sido encomendados.[31] Igualmente, el Alto Foro ha enfatizado que los tribunales, aplicando el criterio de razonabilidad y deferencia, no deben alterar las determinaciones de las agencias.[32] En mérito de lo anterior, los tribunales deben ser cautelosos al intervenir con las conclusiones e interpretaciones de los organismos administrativos especializados.[33] Ahora bien, lo anterior únicamente surtirá efecto si la decisión se basa en evidencia sustancial que obra en el expediente administrativo.[34] En cuanto a la evidencia sustancial, se ha definido como "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una

---

[28] *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 35 (2018).
[29] *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 217 (2012), citando a *Asoc. Fcias. V. Caribe Specailty et al. II,* 179 DPR 923, 940 (2010); *Mun. de San Juan v. JCA*, 149 DPR 263, 279-280 (1999).
[30] *Asoc. Vec. Altamesa Este v. Mun. de San Juan,* 140 DPR 24, 34 (1996).
[31] *Rolón Martínez v. Supte. Policía,* supra, a la pág. 35.
[32] *Íd.*
[33] *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 892 (2008).
[34] *Otero v. Toyota*, 163 DPR 716, 727 (2005).

conclusión".[35] Dicho análisis requiere que la evidencia sea considerada en su totalidad, esto es, tanto aquella que sostenga la decisión administrativa como la que menoscabe el peso que la agencia le haya conferido.[36] Ello, implica que, de existir un conflicto razonable en la prueba, debe respetarse la apreciación de la agencia.[37] Además, la norma de prueba sustancial se sostiene en la premisa de que son las agencias las que producen y determinan los hechos en los procesos administrativos, y no los tribunales.[38]

Debido a la presunción de regularidad y corrección de los procedimientos y las decisiones de las agencias administrativas, quien alegue ausencia de evidencia sustancial tendrá que presentar prueba suficiente para derrotar esta presunción, no pudiendo descansar en meras alegaciones.[39] Para ello, deberá demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración.[40] Si la parte afectada no demuestra la existencia de otra prueba que sostenga que la actuación de la agencia no está basada en evidencia sustancial o que reduzca o menoscabe el valor de la evidencia impugnada, el Tribunal respetará las determinaciones de hecho, y no sustituirá el criterio de la agencia por el suyo.[41] En cambio, las conclusiones de derecho son revisables en todos sus aspectos.[42] Lo anterior fue reiterado por nuestro Tribunal Supremo cuando expresó que "al enfrentarse a un recurso

---

[35] *Batista, Nobbe v. Jta. Directores,* supra, a la pág. 216; *Otero v. Toyota,* supra, a la pág. 728.

[36] *Assoc. Ins. Agencies, Inc. v. Com. Seg. PR,* 144 DPR 425, 437 (1997).

[37] *Hilton v. Junta de Salario Mínimo,* 74 DPR 670, 687 (1953).

[38] Fernández Quiñones, *Derecho administrativo y Ley de Procedimiento Administrativo Uniforme,* 3ra ed., Colombia, Ed. Forum, 2013.

[39] *OEG v. Martínez Giraud,* 210 DPR 79, 89 (2022); *Graciani Rodríguez v. Garage Isla Verde,* 202 DPR 117, 128 (2019); *González Segarra et al. v. CFSE,* 188 DPR 252, 277 (2013); *Pacheco v. Estancias,* 160 DPR 409, 431 (2003).

[40] *Gutiérrez Vázquez v. Hernández y otros,* 172 DPR 232, 244 (2007).

[41] *Otero v. Toyota,* supra, a la pág. 728.

[42] *García Reyes v. Cruz Auto Corp.,* supra, a la pág. 894.

de revisión judicial proveniente de una agencia administrativa será el deber de los tribunales revisar las conclusiones de derecho en todos sus aspectos."[43]

Establecido lo anterior, es de ver que los foros apelativos deberán intervenir con las decisiones de las agencias administrativas cuando: (i) la decisión no esté basada en evidencia sustancial; (ii) la agencia haya errado en la aplicación de la ley; (iii) su actuación resulte ser arbitraria, irrazonable o ilegal, o (iv) la actuación administrativa lesiona derechos constitucionales fundamentales.[44] Entiéndase que, aunque los tribunales están llamados a conceder cierta deferencia a las decisiones administrativas, tal norma no es absoluta. Ello, puesto a que no puede imprimírsele un sello de corrección automático, bajo el pretexto de deferencia, a determinaciones o interpretaciones administrativas que son irrazonables, ilegales o contrarias a derecho.[45]

### B. Proceso de Revocación de la Libertad Bajo Palabra

Mediante el sistema de la libertad bajo palabra, se permite que un persona convicta y sentenciada a un término de cárcel cumpla la última parte de su sentencia fuera de la institución penal, sujeto al cumplimiento de las condiciones que se impongan para conceder el aludido privilegio.[46] Particularmente, este beneficio pretende propiciar que las personas confinadas se reintegren a la sociedad en forma positiva, tan pronto estén capacitados, sin tener que estar encarcelados por todo el término de la sentencia impuesta.[47] Ahora bien, la libertad bajo palabra es un privilegio, no un derecho, el cual se otorga en el mejor interés de la sociedad y cuando las

---

[43] *Vázquez y otro v. Consejo de Titulares y Junta de Directores del Condominio Los Corales y otros,* 2025 TSPR 56, 215 DPR ___ (2025).

[44] *The Sembler Co. v. Mun. de Carolina,* 185 DPR 800, 822 (2012), citando a *Empresas Ferrer v. ARPe,* supra, a la pág. 264.

[45] *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* 213 DPR 743 (2024).

[46] *Maldonado Elías v. González Rivera,* 118 DPR 260, 275 (1987).

[47] *Íd.*

circunstancias establezcan que propiciará la rehabilitación del confinado.[48]

Concedido el privilegio de libertad bajo palabra, si el técnico de servicios sociopenales, asignado a la supervisión del liberado, adviene en conocimiento de que este ha incurrido en una conducta que constituye una posible violación a las condiciones impuestas por la JLBP en el Mandato de libertad bajo palabra precederá realizar una investigación y luego remitirá un informe a la referida junta.[49] Recibido el informe, la JLPB podrá ordenar el arresto del liberado.[50] Empero, deberá celebrar una vista sumaria inicial ante un oficial examinador dentro del término más breve posible.[51] Producto de la vista sumaria inicial, el oficial examinador deberá hacer una relación sucinta de los procedimientos y de su decisión, mediante la cual determinará si existe causa probable para que el alegado infractor continue recluido hasta que la JLBP emita su decisión final.[52]

Subsiguiente, la JLBP deberá de celebrar una vista final para determinar si procede la revocación de la libertad bajo palabra.[53] Además, podrá determinar amonestar, desestimar la querella o modificar las condiciones del mandato. En estos últimos tres (3) casos, deberá ordenar la excarcelación.[54] Será esencial que la Junta tome su decisión a base de preponderancia de prueba, a la luz de la evidencia presentada durante la vista y la totalidad del expediente del caso.[55]

---

[48] *Rivera Beltrán v. J.L.B.P.,* 169 DPR 903, 905 (2007); *Lebrón Pérez v. Alcaide, Cárcel de Distrito*, 91 DPR 567, 573 (1964).

[49] Artículo XIII, Sección 13.4 (A) (1) y (2) del Reglamento de la Junta de Libertad Bajo Palabra, Reglamento Núm. 9603 de 25 de septiembre de 2024.

[50] *Íd.,* Sección 13.4 (C) (1).

[51] Artículo 5 de la Ley de la Junta de Libertad Bajo Palabra, Ley Núm. 118 de 22 de Julio de 1974, 4 LPRA sec. 1505.

[52] Artículo 5 de la Ley Núm. 118, *supra*; Artículo XIII, Sección 3.4 (D) (1) del Reglamento Núm. 9603, *supra.*

[53] Artículo XIII, Sección 3. 4 (E) (1) del Reglamento Núm. 9603, *supra.*

[54] *Íd.,* Sección 3. 4 (F).

[55] Artículo XIV, Sección 14.1 (A) del Reglamento Núm. 9603, *supra.*

Según ocurrió en el caso de marras, la vista final podrá ser presidida por un oficial examinador. Este preparará un informe, en el cual resumirá toda la prueba recibida, expondrá separadamente determinaciones de hecho y conclusiones de derecho, y acentuará los hechos sobre los cuales fundamentó su recomendación.[56] Así, pues, la JLBP evaluará la recomendación del oficial examinador y emitirá una determinación mediante resolución.[57]

### III

En el recurso de marras, el recurrente acude ante nos para que revisemos la *Resolución* emitida por la JLBP, mediante la cual no acogió la recomendación emitida por la Oficial Examinadora luego de presidir la vista administrativa, y dispuso revocarle el privilegio de libertad a prueba. En su pliego, el recurrente alzó cinco (5) errores, de los cuales cuatro (4) de ellos se encuentran estrechamente relacionados. Por tanto, discutiremos el *segundo* error de forma separada, mientras que el *primero, tercero, cuarto* y *quinto* se discutirán en conjunto.

Antes de pasar a discutir los errores esgrimidos por el recurrente, conviene mencionar que, en la tarea de revisar una decisión administrativa, debemos abstenernos de concluir irreflexivamente que las determinaciones e interpretaciones hechas por las agencias son correctas.[58] Para prevenir el referido automatismo, debemos de evaluar si la decisión se basa en evidencia sustancial que obra en el expediente administrativo.[59] A esos efectos, la parte recurrente deberá demostrar, mediante su recurso de revisión judicial, que existe otra prueba en el expediente que impida concluir que la determinación de la agencia fue razonable, de acuerdo con la totalidad de la prueba que tuvo ante su

---

[56] Artículo XIV, Sección 14.2 (A) del Reglamento Núm. 9603, *supra.*
[57] *Íd.*, Sección 14.2 (D).
[58] *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* supra, a la pág. 754.
[59] *Otero v. Toyota*, supra, a la pág. 727.

consideración.[60] En consecuencia, si la parte afectada no demuestra lo anterior, estaremos impedidos de sustituir el criterio de la agencia.[61]

Establecido lo anterior, comenzaremos discutiendo el *segundo* error esgrimido en el presente recurso. Mediante este señalamiento de error, el recurrente nos invita a concluir que la JLPB incidió al disponer que violentó la condición número 21 de su mandato de libertad a prueba.

Iniciamos por indicar que la referida condición establece que el recurrente, "[m]ientras esté disfrutando de SUPERVISIÓN ELECTRÓNICA como condición al privilegio de Libertad Bajo Palabra, acept[a] que se [le] instale el Sistema de GPS y permanecer dentro de las zonas de inclusión establecidas. No [se] acercar[á] ni permanecer[á] en las siguientes zonas de exclusión: **municipios de Cataño, Loíza y Bayamón.**"[62] En otras palabras, para que se configure una violación a esta condición, el recurrente tiene que salir de las zonas de inclusión establecidas y/o acercarse o permanecer en las zonas de exclusión.

Sobre este particular, durante la vista final de revocación, Marcos Torres Vicente (señor Torres Vicente), quien para entonces laboraba como oficial de monitoreo en la unidad de supervisión electrónica del DCR y quien preparó el referido que dio inicio al proceso de revocación que nos ocupa, indicó que, a las 5:39 p.m., del 12 de octubre de 2024, el sistema de monitoreo a su cargo emitió una alerta de pérdida de comunicación del dispositivo asignado al recurrente.[63] Según alegó, el sistema reflejó que el recurrente realizó una trayectoria la cual inició en su lugar de residencia, luego continuó por toda la carretera número 30, subió por el área de

---

[60] *Gutiérrez Vázquez v. Hernández y otros*, supra, a la pág. 244.
[61] *Otero v. Toyota*, supra, a la pág. 728.
[62] SUMAC TA, a la Entrada Núm. 1, Apéndice Núm. 4, Anejo XVI, pág. 72. (Énfasis en el original).
[63] Transcripción de la Vista Final de Revocación, a la pág. 28, líns. 9-11.

Caguas y, en horas de la noche, culminó nuevamente en el lugar de su residencia.[64] Acentuó que, durante la referida trayectoria, el recurrente pasó por los municipios de Humacao, Las Piedras, Gurabo, Caguas, San Juan, Trujillo Alto, **Loíza** y Canóvanas.[65] Adujo que, según lo reflejado por el sistema de monitoreo, esa trayectoria fue bastante amplia y de muchas horas.[66] Posteriormente, durante la vista, a preguntas del representante legal del recurrente, quien solicitó que se le explicara la trayectoria por número de carretera, el señor Torres Vicente atestiguó que el recurrente salió de su casa en Naguabo por la carretera número 3, lo cual llevó hasta el expreso número 52 y, luego, subió por el norte hasta San Juan, en donde estuvo un largo tiempo.[67] Acentuó que, de ahí, el recurrente salió de San Juan, también por la carretera número 3, y, así, llegó nuevamente hasta su casa.[68] Dicho lo anterior, destacó que, el mapa del sistema de monitoreo, generó unos círculos de triangulación que marcaban la trayectoria por la cual transitó el recurrente el día 12 de octubre de 2024.[69] Explicó que los círculos trazaron un área aproximada por la cual pasó el recurrente durante ese día, de modo que, este pudo haber estado en cualquier lugar dentro de los círculos, pero no se sabía con exactitud en dónde.[70] Reseñó que, dentro de los círculos, estaban los municipios de Carolina, Canóvanas y **Loíza**.[71]

Por otro lado, en el trascurso del testimonio de Nina Quiñonez Rodríguez, quien para entonces era gerente del programa de supervisión electrónica del DCR y del Programa de Servicios con Antelación al Juicio, a quien fue referido el caso del recurrente para

---

[64] Transcripción de la Vista Final de Revocación, a la pág. 28, líns. 16-21.
[65] *Íd.*, a la pág. 29, líns. 1-2. (Énfasis suplido).
[66] *Íd.*, a la pág. 31, lín. 2.
[67] *Íd.*, a las págs. 42-43, líns. 6-20 y 1-12, respectivamente.
[68] *Íd.*, a la pág. 43, líns. 11-12.
[69] *Íd.*, a las págs. 44 y 45, líns. 19-22 y 1-16, respectivamente.
[70] *Íd.*, a la pág. 46, líns. 13-23.
[71] *Íd.*, a las págs. 45 y 46, líns. 20 y 4, respectivamente.

investigación, esta manifestó que la trayectoria que inició recurrente, en la fecha antes reseñada, era incompatible con otras rutas que él había tomado antes, en el sentido de que este no tenía permiso de salida ni permiso autorizado para el día sábado.[72] Enfatizó que, durante el periodo evaluado, no había una trayectoria como la del aludido día 12 de octubre, esta era totalmente diferente.[73] De otra parte, explicó que, dado a que el dispositivo del recurrente estaba evidentemente manipulado, únicamente tenía cobertura celular, y no satelital, de manera que, el mapa del sistema de monitoreo no presentaba la latitud y longitud exacta en la cual se encontraba el recurrente.[74] Así, pues, el referido sistema solo generaba unos círculos de triangulación, según subrayó el señor Torres Vicente.[75] En cuanto a este particular, explicó que el dispositivo tiene varios módulos en su interior, uno de cobertura satelital y otro de cobertura celular, *ergo*, tiene dos (2) señales diferentes.[76] Adujo que, para poder determinar la longitud y latitud del recurrente, el dispositivo debía tener cobertura satelital, al no tenerla, debido a la manipulación efectuada, el sistema únicamente reflejó unos aros de confianza, los cuales no establecen con exactitud el lugar, si no, un área de acuerdo a las antenas y repetidores que se comunican con el dispositivo.[77] Siendo así, razonó que el hecho de que los círculos marcaran las referidas áreas, no necesariamente significaba que el recurrente pasó por un lugar que fuese de exclusión.[78] A preguntas del representante legal del recurrente, orientó que los aros de confianza significaban que el recurrente estaba dentro del área trazada por los referidos círculos

---

[72] Transcripción de la Vista Final de Revocación, a la pág. 56, líns. 19-22.
[73] *Íd.*, a las págs. 57 y 59 líns. 14-21 y 17, respectivamente.
[74] *Íd.*, a las págs. 60, 61, 67 y 68, líns. 18-19, 20-21, 13-14, 15-18, respectivamente.
[75] *Íd.*, a la 68, líns. 15-18
[76] *Íd.*, a las págs. 67 y 68, líns. 19-21 y 4-5,
[77] *Íd.*, a la pág. 68, líns. 12-18.
[78] *Íd.*, a la pág. 76, líns. 2-5.

y fuera de su *zona de inclusión*.[79] Expresó que, en el mapa ya mostrado por el señor Torres Vicente, los círculos de triangulación mostraban cómo el señor Jiménez Cabrera salió de su *zona de inclusión*, al tomar, durante el día 12 de octubre, rutas por Caguas, Gurabo, San Juan, el Norte y luego el Este de la Isla.[80] Resaltó que, ese día, el recurrente comenzó por Este, luego fue hacia el Sur y hacia el Oeste, para, posteriormente, regresar a su *zona de inclusión*.[81] Más adelante, especificó que la *zona de inclusión* del recurrente era la parcela Florida, Naguabo, Puerto Rico.[82]

Durante esta vista de revocación, el recurrente presentó dos (2) testigos, siendo el primero Juan Alberto Marchena Martínez (señor Marchena Martínez), patrono de este. El testimonio del señor Marchena Martínez, esencialmente, se limitó a establecer que el recurrente se reportó a trabajar el sábado, 12 de octubre de 2024, en el horario de ocho (8) de la mañana hasta el mediodía.[83] Ahora bien, luego de exponer su testimonio, a preguntas de la oficial examinadora, la señora Myriam Montañez Serrano (señora Montañez Serrano), quien para entonces era la técnica a cargo del caso del recurrente, aseveró que este no tenía permiso para trabajar ese día.[84]

Como segundo testigo, el recurrente presentó a Carlos R. Eliecer Encarnación, un investigador privado, sin ninguna experiencia en supervisión electrónica.[85] En suma, el testimonio de este se basó en cómo corroboró la versión de los hechos de lo ocurrido el día 12 de octubre de 2024, según la explicación que le brindó el recurrente, en cuanto a la trayectoria que realizó ese día. Al inició de su testimonio, manifestó que fue contratado para hacer

---

[79] Transcripción de la Vista Final de Revocación, a la pág. 71, líns. 12-15.
[80] *Íd.*, a la pág. 71, líns. 14-15.
[81] *Íd.*, a la pág. 72, líns. 1-2.
[82] *Íd.*, a la pág. 75, lín. 23.
[83] *Íd.*, a la pág. 82, líns. 8-17.
[84] *Íd.*, a la pág. 85, líns. 1-3.
[85] *Íd.*, a las págs. 6 y 85, líns. 1-8 y 20-23, respectivamente.

una investigación conducente a establecer si el recurrente, en algún momento, usando el grillete que tenía puesto, había pasado por el área de exclusión, particularmente por el Municipio de Loíza.[86] A preguntas del representante legal del recurrente, en cuanto a cuál ruta tomó su representado el día en cuestión, para llegar a su casa, este manifestó:

> sale de la vía 6 a la Rafael Carrión, llega a la esquina de La Monserrate, dobla la Monserrate y continúa esa...la Monserrate completa. Tiene que cruzar la avenida Fidalgo Díaz, que es la que conduce a Plaza las...Plaza Carolina, luego tiene que cruzar la avenida eh...Roberto Clemente y luego tiene que cruzar la avenida Calderón. De ahí cae a la carretera 8874. Esa carretera conduce al Barrio La Central Canóvanas. **Por esa carretera usted va o al pueblo de Canóvanas o al pueblo de Loíza**. [É]l va por la 8874 **al llegar a la carretera 951 que es la que entra para Loíza**, lo que tiene que hacer es doblar a la derecha...y sale hasta la calle principal de Canóvanas, luego dobla a la izquierda y está la 65 y ahí se va hacia Maunabo, su residencia.[87]

En vista de todo lo antes expuesto, este Panel coincide en que el 12 de octubre de 2024, el recurrente, tanto salió de su *zona de inclusión*, así como se acercó a los municipios incluidos en su zona de *zona de exclusión*, particularmente al pueblo de Loíza. Lo anterior, fue confirmado por los propios testigos de la parte recurrente, de manera que, este no logró demostrar que existía otra prueba en autos que señalara que la determinación tomada por la JLBP fue errónea, conforme requiere el ordenamiento jurídico vigente.

Específicamente, resaltamos que, según se desprende de los testimonios narrados, la parte recurrente, en la fecha antes señalada, salió de su *zona de inclusión*, es decir, la parcela Florida del Municipio de Naguabo, Puerto Rico, en un día en el cual debía permanecer recluido en su hogar y en el cual no tenía ninguna autorización para salir y/o trabajar. Pese a que su representante legal se opuso, durante toda la vista, a que se hiciera referencia a

---

[86] Transcripción de la Vista Final de Revocación, a la pág. 86, líns.7-12.
[87] *Íd.*, a las págs. 87-88, líns. 16-22 y 1-2, respectivamente.

este hecho, en virtud de que no se le imputó un cargo recurrente sobre violación de horario. A nuestro juicio, dado a que la condición número 21 le exige al recurrente quedarse dentro de su *zona de inclusión,* el hecho de que el recurrente no estaba autorizado a salir de dicha zona durante el día en cuestión es claramente relevante para disponer del presente caso. Incluso, lo anterior, basta para determinar que el recurrente violó la condición número 21 de su mandato de libertad a prueba, ya que esta condición no solo manda a no acercarse a la *zona de exclusión,* si no también le requería quedarse en su *zona de inclusión.*

Por otro lado, conviene mencionar, que contrario a lo que nos invita a concluir el recurrente, de un examen de la totalidad de los testimonios presentados en la vista final de revocación, en los cuales se especificó la ruta transitada por este, el día 12 de octubre de 2024, se desprende, sin lugar a duda, que este, al menos, se acercó a su zona de exclusión. Según explicó la señora Quiñones Rodríguez, en la vista de revocación, el recurrente tenía asignada una ruta específica para ir a su trabajo y volver a casa, empero, la zona que el utilizó el día 12 de octubre, era una por la cual él no estaba autorizado a pasar. Destacó que, de ordinario, el recurrente utilizaba la ruta de Naguabo para salir de su casa, y regresaba nuevamente por la carretera de Caguas.[88] Siendo así, colegimos que el *segundo* error esgrimido en el recurso de marras no se cometió. Ello, puesto a que es claro que el recurrente violó la condición número 21 de su mandato de libertad a prueba.

Pasemos ahora al *primer, tercer, cuarto* y *quinto* error, esgrimidos. En síntesis, en estos errores alzados, el recurrente aduce que la JLBP cometió el error de revocarle el privilegio de tener libertad bajo palabra en contravención a la recomendación de la

---

[88] Transcripción de la Vista Final de Revocación, a la pág. 99, líns. 12-23.

Oficial Examinadora, mediante fundamentos no imputados formalmente, al concluir que el recurrente manipuló su dispositivo electrónico sin contar con prueba técnica certificada ni testimonio pericial, y al disponer que se violentó la condición número 34, sin evidencia directa.

De entrada, puntualizamos que al recurrente se le imputó haber violentado, específicamente, los incisos (a) (b) y (e) de la aludida condición número 34. Los referidos incisos disponen que se incurrirá en violación a esta condición por:

> a. pérdida de la señal del transmisor, por estar fuera del área delimitada por la programación establecida o por el técnico de servicio sociopenal;
>
> b. señal de obstrucción o daño al dispositivo (grillete), a la unidad de rastreo portátil o al equipo;
>
> [. . .].
>
> e. salir de la zona de inclusión establecida;
>
> [. . .].

Distinto a la condición número 21, esta condición dispone que "[e]l incumplimiento [con cualesquiera de sus incisos] constituirá causa suficiente, por sí sola, para la revocación de la libertad bajo palabra". Establecimos, previamente, que la prueba testimonial presentada en la vista final de revocación demostró, sin lugar a duda, que el recurrente salió de su *zona de inclusión* establecida. De manera que, según dispone la condición número 34, la comisión de dicha violación era suficiente para que la JLBP tuviese facultad para revocarle al recurrente su privilegio de libertad a prueba. Sin embargo, colegimos que es menester reseñar que la prueba de autos, igualmente, demostró que los incisos (a) y (b) de la aludida condición también fueron infringidos por el recurrente. Entiéndase, que este obstruyó su dispositivo al punto de que el grillete perdió la señal satelital. Veamos.

En la vista de revocación, el señor Torres Vicente señaló que el primer indicio de que el grillete del recurrente estaba manipulado

era que el mapa provisto por el sistema de monitoreo marcó su trayectoria en color gris.[89] Explicó que el mapa únicamente marca la trayectoria de ese color cuando el grillete está manipulado.[90] Según alegó, tan pronto el sistema emitió una alerta de pérdida de señal, este intentó comunicarse con el recurrente al número que estaba en sistema, pero no hubo respuesta.[91]

Por su parte, la señora Quiñonez Rodríguez, atestiguó que, tan pronto el señor Torres Vicente se percató que el grillete estaba manipulado, le envió una comunicación para se investigara el suceso.[92] Esta, acentuó que ella misma llevó a cabo la referida investigación, la cual conllevó verificar el dispositivo desde que fue asignado al recurrente.[93] Según su investigación, las dos (2) coberturas de señal estaban funcionando perfectamente, hasta tanto el recurrente manipuló el dispositivo comenzado a las 6:53 a.m. del 12 de octubre de 2024.[94] Explicó que, pese a que la cobertura satelital que tiene el dispositivo es muy potente, cuando se encuentra manipulado, como ocurrió en este caso, esta es la primera señal que se pierde.[95] Asimismo, la señora Quiñonez Rodríguez reseñó que, porque se pierda la cobertura satelital, no se llega automáticamente a la conclusión de que el dispositivo fue manipulado, ya que hay una combinación de factores.[96] Indicó que particularmente, en este caso, en adición a la pérdida de señal, se tomó en consideración: (i) la disminución de potencia de la señal celular;[97] (ii) que durante el día 12 de octubre, el dispositivo emitió una serie de alarmas;[98] (iii) que los dispositivos de otros participantes, en las mismas zonas geográficas, se estaban

---

[89] Transcripción de la Vista Final de Revocación, a la pág. 48, líns. 10-22.
[90] *Íd.*, a la pág. 49, líns. 1-22.
[91] *Íd.*, a la pág. 52, líns. 6-22.
[92] *Íd.*, a la pág. 54, líns. 9-19.
[93] *Íd.*, a las págs. 55 y 56, líns. 4-5 y 2-5, respectivamente.
[94] *Íd.*, a la pág. 68, líns. 21-23.
[95] *Íd.*, a la pág. 70, líns. 8-9.
[96] *Íd.*, a la pág. 73, líns. 10-15.
[97] *Íd.*, a la pág. 73, líns. 19-21.
[98] *Íd.*, a la pág. 74, líns. 7-11.

reportando todos con normalidad,[99] y (iv) que no hubo ninguna avería por parte de los proveedores de comunicación satelital ni celular durante el periodo de tiempo evaluado.[100] Así, pues, expuso que fue la combinación de todos esos factores que le llevó a la conclusión de que el dispositivo en efecto fue manipulado.[101]

En mérito de todo lo anterior, entendemos en que se probó efectivamente, mediante la prueba testimonial, que el recurrente obstruyó la señal del dispositivo. Lo anterior, no fue refutado ni controvertido por el Jiménez Cabrera. Por ende, concluimos que el recurrente infringió tanto los incisos (a) (b) y (e) de la condición número 34 de su mandato de libertad a prueba. Siendo así, no había ningún impedimento para que la JLBP le revocará tal privilegio.

Ahora bien, juzgamos necesario detenernos sobre dos planteamientos esbozados por el recurrente, antes disponer sobre la comisión de los errores ante nuestra consideración. El primero de estos planteamientos es que la JLBP erró al emitir una determinación en contravención a la recomendación de la Oficial Examinadora. Sobre este particular, es menester reseñar que la función del oficial examinador es meramente presidir la vista de revocación y presentar una recomendación para la consideración de la JLBP, quien es responsable de emitir una determinación final.[102] Pese a que, en este caso, la Oficial Examinadora solo recomendó amonestar al recurrente, dado a que la condición numero 34 era clara en que la violación de cualquiera de sus incisos era motivo por sí solo para revocar el beneficio de libertad a prueba, no encontramos impedimento para que la JLBP optara por un remedio distinto al recomendado. Abona a lo anterior y es norma harta conocida que la libertad bajo palabra es un privilegio, no un derecho,

---

[99] Transcripción de la Vista Final de Revocación, a la pág. 75, líns. 12-14.
[100] *Íd.*, a la pág. 75, líns. 14-15.
[101] *Íd.*, a la pág. 75, líns. 16-19.
[102] Artículo XIV, Sección 14.2 (A) y (D) del Reglamento Núm. 9603, *supra.*

que se otorga únicamente cuando las circunstancias propicien la rehabilitación del confinado.[103]

El segundo planteamiento del recurrente que amerita nuestra atención es su argumento de que la JLBP emitió una determinación sin contar con prueba técnica certificada, ni testimonio pericial. Ante este planteamiento, conviene mencionar que según nuestro esquema probatorio "la evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley".[104] Por tanto, no es necesario presentar prueba pericial para probar un hecho.

No obstante, lo anterior, es menester resaltar que todos los testigos que suplieron su testimonio en la vista, excepto los traídos por la parte aquí recurrente, eran conocedores en el área de supervisión electrónica. Esto, fue ratificado por el representante legal de la parte aquí recurrente, quien indicó, específicamente en cuanto el testimonio de la señora Quiñones Rodríguez, que no podía rebatir el hecho de que su representado manipuló el grillete porque esta era una persona perito en el área.[105] Finalmente, es preciso resaltar que en los procedimientos ante la JLBP las reglas de evidencia no obligan.[106] De manera que en estos procedimientos son aún más laxos los requerimientos para probar un hecho.

A tenor con todo lo antes expuesto, nos es forzoso concluir que el *primer, tercer, cuarto* y *quinto* error *tampoco se cometieron.*

Establecido lo anterior, insistimos que, al evaluar minuciosamente la totalidad de los autos ante nuestra consideración, incluyendo las posiciones de las partes, la transcripción de la prueba oral, así como el marco legal y bajo el marco doctrinal aplicable, resulta evidente que no procede nuestra

---

[103] *Rivera Beltrán v. J.L.B.P.,* supra, a la pág. 905; *Lebrón Pérez v. Alcaide, Cárcel de Distrito,* supra, a la pág. 573.
[104] Regla 110 (d) de Evidencia, 32 LPRA Ap. VI, R. 110.
[105] Transcripción de la Vista Final de Revocación, a la pág. 93, líns. 2-5.
[106] Artículo XI (D) del Reglamento Núm. 9603, *supra.*

intervención para cambiar el dictamen recurrido. Reiteramos que los errores alzados por el recurrente no fueron cometidos. En consecuencia, procede confirmar la *Resolución* recurrida.

IV

Por los fundamentos que anteceden, se *confirma* la *Resolución* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones